IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Carolyn J. Harrison,                         )<br>                              Plaintiff,    )<br>                                              )<br>          vs.                                 )<br>                                              )<br> Carolyn W. Colvin,                           )<br> Commissioner of Social Security,[1]          )<br>                                              )<br>                              Defendant.    )<br>_____)| Civil Action No. 6:13-cv-1453-MGL-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

      This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

      The plaintiff, who is proceeding *pro se*, brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

      The plaintiff filed an application for SSI on July 15, 2010, alleging that she became unable to work on January 1, 2000.  The application was denied initially on October 18, 2010, and on reconsideration on February 4, 2011, by the Social Security Administration.  On March 7, 2011, the plaintiff requested a hearing.  The administrative law judge ("ALJ"),

---

    [1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

    [2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

before whom the plaintiff and her attorney appeared on July 2, 2012, considered the case *de novo*, and on August 22, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on April 17, 2013. The plaintiff then filed this action for judicial review.

The plaintiff filed a prior Title XVI application on November 13, 2002, alleging disability since January 1, 2000. This claim was denied by an ALJ on July 28, 2006. On October 28, 2008, the Appeals Council affirmed the ALJ's decision. Thus, the ALJ decision of July 28, 2006, remains final and binding, and the doctrine of administrative res judicata applies with regard to the period through July 28, 2006. *See*, *e.g.*, *Cleaton v. Sec'y of Health and Human Servs.*, 815 F.2d 295, 297–301 (4th Cir. 1987); and *McGowen v. Harris*, 666 F.2d 60, 65–69 (4th Cir. 1981). Accordingly, the current decision addresses the time period from July 15, 2010, the date of her current application for SSI, through August 22, 2012, the date of the decision.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant has not engaged in substantial gainful activity since July 15, 2010, the application date (20 C.F.R § 416.971 *et seq*).
>
> (2) The claimant has the following severe impairments: osteoarthritis of the right foot/ankle, osteoarthritis, carpal tunnel syndrome, and chronic low back pain (20 C.F.R. § 416.920(c)).
>
> (3) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).

2

(4)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 416.967(b). She can stand and/or walk about six hours in and eight-hour workday and sit about six hours in an eight-hour workday.

(5)    The claimant has no past relevant work (20 C.F.R. § 416.965).

(6)    The claimant was born on December 30, 1958, and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 C.F.R. § 416.963).

(7)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964).

(8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since July 15, 2010, through the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

3

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he or she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his or her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). The plaintiff must make a prima facie showing of disability by showing he or she is unable to return to his or her past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his or her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of

4

impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### EVIDENCE PRESENTED

In November 2009, the plaintiff presented to Springs Memorial Hospital emergency department in Lancaster, South Carolina, complaining of soreness in her shoulders and legs after getting into a "tussel [sic]" (Tr. 216, 218).  She was given Toradol and was discharged (Tr. 220).  In March 2010, the plaintiff presented to the hospital's emergency department requesting medication for low-back pain, which she rated as a

6/10 (Tr. 209).  She was given Toradol and was discharged (Tr. 213).  In May 2010, the plaintiff presented to the hospital's emergency department complaining of right foot pain after falling off her steps (Tr. 200).  X-rays showed mild soft tissue swelling and a "bipartite or potentially fractured" tibial sesamoid.  However, there was no swelling or deformity upon clinical examination (Tr. 204, 207).  The plaintiff was given Tramadol and was discharged fifteen minutes later with no pain (Tr. 204-05).  Approximately one week later, the plaintiff requested a walking boot so that she could attend a graduation ceremony.  She was in no acute distress and had normal range of motion and motor strength in all four extremities (Tr. 365-66).  Less than three weeks later, the plaintiff appeared normal upon physical examination, except for a superficial abrasion and mild tenderness in her right foot.  She walked with a limp and used a four-prong cane (Tr. 227, 370).  X-rays of her right ankle were negative (Tr. 228, 236).  She was diagnosed with a contusion and sent home in an ACE bandage (Tr. 231).

In August 2010, the plaintiff presented to Premier Clinics in Rock Hill complaining of low-back and wrist pain after moving furniture.  The examining physician noted slight tenderness in the plaintiff's left shoulder blade area and neck, but no overt injury.  She was prescribed narcotic pain medications and a topical lotion, and was given a Toradol injection (Tr. 173).

In September 2010, the plaintiff presented to the emergency department at Springs Memorial complaining of a rash on her right arm.  She denied having any pain (Tr. 194).  One week later, she returned to Premier Clinics for treatment of her rash and hand pain, for which she received narcotic pain medication and anti-inflammatory drugs (Tr. 174).  Four days later, she reported back pain after she "went up some steps and wasn[']t suppose[d] to."  Upon physical examination, the plaintiff ambulated with a four-prong cane, but appeared to be in no acute distress.  Her lumbar/sacral region was tender, but her

range of motion was intact.  She requested and received a Toradol injection and Lidoderm patches (Tr. 175).

In November 2010, the plaintiff again presented to the emergency department at Springs Memorial complaining that she hurt her back while cleaning and climbing on things the day before.  She rated her pain as a 6/10.  She appeared normal upon physical examination, with full, painless range of motion in her neck, spine, and extremities; normal reflexes; and no apparent motor or sensory deficits.  She was discharged in good condition less than thirty minutes after arriving (Tr. 186, 187, 190).

In December 2010, the plaintiff fractured her right ankle during a fall (Tr. 223, 252).  Her ankle was swollen and tender, without gross laxity, but her motor and sensory functioning were normal.  She was given a cast and instructed to follow up in four weeks (Tr. 252).

In January 2011, the plaintiff presented to Springs Memorial emergency department complaining of chronic left knee pain that flared up after she fell four days earlier (Tr. 323).  A physical examination showed only mild tenderness, with normal joints, range of motion, and gait (Tr. 325).  The plaintiff requested and received a cortisone shot, and rated her pain as a 2/10 upon discharge (Tr. 323, 327).

In February 2011, the plaintiff's right ankle cast was removed, but she continued to allege right foot pain (Tr. 330).  Less than two weeks later, she went to the hospital's emergency department complaining that she fell and injured her heel while making her bed (Tr. 337, 341).  The attending clinician noted swelling, erythema, and tenderness in the right ankle, with limited range of motion due to pain.  The plaintiff's foot was re-splinted (Tr. 338, 341).

In March 2011, the plaintiff returned to Premier Clinics complaining that she aggravated her low-back pain when she fell on her right side.  She also alleged stiffness

7

in her right hand and numbness/tingling in both hands.  She requested and received a hydrocodone refill and a Toradol injection (Tr. 454).

In April 2011, the plaintiff presented to Premier Clinics complaining that her ankle hurt because the orthopedist had taken her cast off too soon.  The attending clinician noted that the plaintiff had not followed the orthopedist's instructions and had refused another referral, insisting that she would manage the pain with home remedies. The plaintiff refused to elevate and ice her foot as directed.  She also declined a Toradol injection and a trigger point injection for her CTS (Tr. 455).  During a follow-up examination three weeks later, the plaintiff was still on crutches and reported that two orthopedists had said there was nothing more they could do for her.  The attending clinician noted that the plaintiff would need to attend a pain clinic and/or physical therapy to improve her chances of recovery.  The clinician recommended aerobic exercises and filled out "[h]uge disability forms from [Plaintiff's] employer" (Tr. 456).[3]

In May 2011, the plaintiff presented to Premier Clinics wearing a cast on her right ankle.  She advised the attending clinician that she had recently re-fractured the ankle and wanted a power wheelchair (Tr. 458).  She was referred to physical therapy for evaluation.  One month later, the plaintiff returned requesting that her treating physician, Dr. Bamidele Ekunsanmi, complete a form so that she could obtain a power wheelchair from the scooter store.  Dr. Ekunsanmi refused, noting that the plaintiff did not need a power wheelchair and should "try to get back to a higher functional capacity."  He also refused the plaintiff's request for hydrocodone, Flexeril, and anxiety medication. He noted that the plaintiff had not previously been prescribed anxiety medication (Tr. 459-60).

When the cast was removed from the plaintiff's ankle in July 2011, she reported that her foot was still very swollen and painful (Tr. 344).  Her orthopedist

---

[3]  It is not clear who the employer was, and the disability forms are not in the record.

instructed her to resume weight-bearing activities, but the plaintiff complained that it was too painful and requested that the cast be replaced (Tr. 345, 348, 391).  X-rays revealed severe osteopenia (decreased bone mass), but no acute fracture or dislocation (Tr. 394). The plaintiff was advised to continue using crutches, bearing weight as tolerated (Tr. 346, 350).  One week later, the plaintiff returned to Premier Clinics seeking orthopedic boots and a wrist brace.  She was encouraged to exercise thirty minutes per day, five times per week (Tr. 461).

In August 2011, the plaintiff reported pelvic pain, an upset stomach, and increased stress, which she attributed to her recent eviction from her house (Tr. 463). Shortly thereafter, the plaintiff again presented to Springs Memorial emergency department complaining of low-back pain that she sustained going up and down steps while she was moving (Tr. 352).  She appeared completely normal upon physical examination, and X-rays of her lumbar spine were unremarkable (Tr. 353-54, 359).

In October 2011, the plaintiff returned to Premier Clinics seeking a Toradol injection after bumping her right foot on the stairs.  She acknowledged that she had been non-compliant with her orthopedist's orders.  X-rays revealed no acute fracture (Tr. 465).

In November 2011, the plaintiff requested hydrocodone, a Toradol injection, and a prescription for a cane.  Upon physical examination, she showed symmetrical deep-tendon reflexes and motor strength, no sensory defects, and a normal gait.  The attending clinician gave the plaintiff a prescription for Tramadol and administered a Toradol injection, but denied her request for hydrocodone, noting that she had not "had [a] script in months" (Tr. 464).

In December 2011, the plaintiff reported that she became dizzy and passed out in her bathroom, but did not go to the hospital.  She was given a Toradol injection (Tr. 466).  One week later, she said she felt better, with no dizziness (Tr. 467).  In February 2012, the plaintiff alleged right shoulder pain and requested a cortisone shot in her left

9

knee. An examination revealed no abnormality in the right shoulder; however, she had joint tenderness and her shoulder range of motion and right-hand grip strength were reduced (Tr. 468).

Several days later, the plaintiff presented to Lancaster Orthopaedics for evaluation of her right foot and ankle. Upon examination, she had an anatalgic gait; no effusion or swelling; positive midfoot tenderness; painful but unrestricted range of motion; intact sensation; no instability; and 5/5 strength. X-rays revealed osteopenia throughout the plaintiff's right foot, but her old fracture had healed and no acute bony abnormality was noted (Tr. 502). A subsequent MRI of the plaintiff's right foot showed mild degenerative changes at the base of the first proximal phalanx, without evidence of a stress fracture (Tr. 500). The plaintiff was diagnosed with midfoot synovitis/osteoarthritis and was prescribed custom orthotics (Tr. 501).

In March 2012, the plaintiff reported anxiety and depression. The clinician at Premier Clinics diagnosed adjustment disorder with anxiety and depression (Tr. 470).

### Medical Source Statements

In October 2011, Dr. Ekunsanmi filled out a questionnaire in which he opined that the plaintiff could sit for seven hours; could stand/walk for zero to two hours; was able to sit continuously in a work setting; could frequently lift less than ten pounds, rarely lift ten pounds, and never lift twenty pounds; had significant limitations with regard to repetitive reaching, handling, fingering, or lifting; required a cane to stand/walk; could not stoop, push, kneel, pull, or bend; and had no psychological, visual, or environmental limitations (Tr. 429-31). Dr. Ekunsanmi also opined that the plaintiff could not sustain a full-time job; that emotional factors contributed to the severity of her symptoms and limitations; that she was not a malingerer; that she was capable of low-stress work; and that she would likely need to be absent from work two to three times per month. He did not explain his

conclusions or cite any clinical findings to support them, but stated that the plaintiff had been referred to an orthopedic specialist to assess her limitations (Tr. 431-32).

### State Agency RFC Assessments

In October 2010, State agency physician Carl Anderson, M.D., reviewed the plaintiff's available medical records and opined that she had the exertional capacity to perform medium work (Tr. 245). He also opined that she could frequently climb ramps/stairs, balance, stoop, kneel, crouch, crawl, and handle or finger objects; could occasionally climb ladders/ropes/scaffolds; and was required to avoid concentrated exposure to workplace hazards (Tr. 246-48). Dr. Anderson noted that the plaintiff's allegations "are several magnitudes worse than clinical evidence would suggest," and that there was "[l]ittle evidence for severe impairments" (Tr. 249).

In February 2011, upon review of an updated record, State agency physician William Hopkins, M.D., opined that the plaintiff was capable of performing the full range of medium work (Tr. 270-77). He noted that the plaintiff was not credible and that her fractured ankle should heal without significant long-term effects (Tr. 275).

In December 2010, State agency psychologist Michael Neboschick, Ph. D., opined that the plaintiff did not have a medically determinable mental impairment, notwithstanding her recent allegation that she was depressed (Tr. 256-68 (citing Tr. 124)).

### Plaintiff's Testimony and Statements

In her November 2010 Form SSA-3373 Function Report, the plaintiff stated that she prepared simple meals for herself; did not clean or do yard work; could go out alone; could ride in a car and driving short distances; shopped for groceries once per month; read once per week; watched television daily; talked on the telephone once or twice per week; and regularly attended church (Tr. 135-37).

At her July 2012 hearing, the plaintiff testified that she had little work history because she suffered from grand mal seizures for about four or five years beginning when

she was nineteen years old (Tr. 512-13). Her seizure problems later resolved (Tr. 513). With regard to her present impairments, she testified that the worst problem was the CTS in her right hand, which she treated with cortisone injections that "didn't do any good" (Tr. 514-15). The plaintiff identified low-back pain as her second-worst ailment, adding that her treatment was limited to "medication and pain shots." She said she could not climb steps and sometimes needed to lie down. She also alleged problems with her right foot and ankle, which required her to wear an air boot (Tr. 516-17). She testified that she had undergone arthroscopic surgery on her left knee and received cortisone shots to relieve the inflammation. The plaintiff reported difficulty reaching up, occasional numbness/tingling in her fingers, and an itchy left hand (Tr. 519-20). She estimated that she could stand for ten minutes before needing to sit, and that she would walk out of a grocery store if the line were too long (Tr. 521-22). She testified that she had problems walking, but that "I'm the type of person that I can do stuff on my own and I just push myself on." At the same time, she testified that she could not walk outside to get mail, could not walk around her neighborhood, and had problems with balance but could not afford a cane. She said that she previously had three canes, but did not know what happened to them (Tr. 523).[4]

The plaintiff testified that alternating between walking and sitting provided some relief because it took pressure off her back; however, if she sat too long, she would experience radiating numbness in her lower back. She occasionally elevated one or both legs while sitting, but generally could get up without assistance. She could drive or ride in a car without stopping for breaks, provided she had enough room to get comfortable (Tr. 524-26). With regard to her alleged carpal tunnel syndrome, the plaintiff testified that she could not carry anything heavy in her right hand, but could carry a gallon of milk with

---

[4] At the hearing, the plaintiff wore a walking boot, but walked into the hearing room without difficulty and without an assistive device (Tr. 22).

her left hand or both hands (Tr. 526-27). She stated that she could not open jars, pick up coins, or write with her right hand. She testified that she could bend to the side, but not over, and could climb stairs "to the side" (Tr. 528-29). She did not have much trouble twisting from side to side, however, because her medication "helps a whole lot." The plaintiff testified that one of her pain medications, Tramadol, made her feel like she was going to have a seizure, so she did not take it as often as the others (Tr. 529). She testified that her medications made her sleep, but that she slept poorly due to pain and her "environment," which she described as a "high[-]aggravated nature place" with "a lot of killing and fighting" (Tr. 530).

With regard to activities, the plaintiff testified that she no longer played tennis, went to cookouts, or took long rides to the beach (Tr. 531-32). She said she did not do much of anything during a typical day. She would get up in the morning, fix herself something to eat, sit in a chair, watch television, and fall asleep (Tr. 532). She said she could not watch a television show from beginning to end because her medication made her fall asleep. The plaintiff testified that she had been prescribed medication for anxiety (Tr. 533). She reported difficulty remembering things, which she attributed to her medication. When asked if she thought she could make it through an eight-hour workday on a good day, she responded: "It depends. No, um-hmm. I don't think so" (Tr. 534).

## ANALYSIS

The current decision addresses the time period from July 15, 2010, when the plaintiff was 51 years old, through August 22, 2012, the date of the decision, at which time she was 53 years old. The ALJ found that the plaintiff osteoarthritis of the right foot/ankle, osteoarthritis, carpal tunnel syndrome, and chronic low back pain were severe impairments. The ALJ further determined that the plaintiff has the residual functional capacity to perform light work with other limitations as set forth above. In her brief, the

13

plaintiff argues she has lumbar disease, diabetes, chronic pains, and gout and that the ALJ should not have denied her benefits (doc. 29 at 1).

The Commissioner contends that substantial evidence supports the ALJ's decision (doc. 31 at 12). Specifically, the Commissioner argues: (1) the ALJ properly weighed the opinion evidence in the record to conclude that the plaintiff could perform a full range of light work (doc. 29 at 13-15); and (2) the ALJ properly evaluated the plaintiff's credibility (doc. 29 at 15-17).

In her response brief, the plaintiff states or contends: (1) she is disabled with an on-the job injury and back injury; (2) she was not paid for her back injury by Aramark Corporation; and (3) she did not have a lawyer for her worker's compensation claim (doc. 33 at 1). Appended to the plaintiff's response brief are copies of a letter dated February 4, 2000, from a claim manager for the Aramark Corporation (doc. 33-2 at 1); a copy of discharge instructions dated January 1, 2014 from Springs Memorial Hospital (doc. 33 at 2-6); and a list dated January 1, 2014, of the plaintiff's medications(doc. 33 at 7).

### Opinion Evidence and Credibility

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about

the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001), which is cited in *Bull v. Colvin*, Civil Action No. 6:12-3197-DCN, 2014 WL 692886, at *16 (D.S.C. Feb. 21, 2014). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g.,

16

lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *3; see also 20 C.F.R. §§ 404.1529(c), 416.929(c).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:   (1)   the examining relationship; (2)  the length of the treatment relationship and the frequency of the examinations; (3)   the nature and extent of the treatment relationship; (4)   the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.   These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5; see also Underwood v. Ribicoff, 298 F.2d 850, 851–52 (4th Cir. 1962) (physician's finding of "disability" not necessarily binding on the Commissioner because such a conclusion is on the ultimate issue).

The ALJ weighed the opinion of the examining psychologist Dr. Neboschick, who concluded that the plaintiff did not have a medical determinable mental impairment: The administrative record indicates only a one-time diagnosis by a treating physician with respect to a mental health issue.  In an office visit on March 12, 2012, the plaintiff was diagnosed with an adjustment disorder with anxiety and depression (Tr. 256-68, 470). The plaintiff was given a Toradol injection at Premier Clinics and was prescribed Tramadol.  The plaintiff testified at the ALJ hearing on July 2, 2012, that she was taking Tramadol for anxiety (Tr. 529). Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986) (if

17

symptom or condition "can be reasonably be controlled by medication or treatment, it is not disabling"). There are no records in the administrative transcript showing any other subsequent treatment for mental health matters after the March 12, 2012, office visit at Premier Clinics. Hence, the ALJ properly concluded that, in light of the one-time treatment for mental health issues, the plaintiff did not have a medically determinable mental impairment (Tr. 21-22).

Dr. Ekunsanmi of Premier Clinics in Rock Hill, South Carolina, is the plaintiff's primary treating physician. In his Medical Source Statement prepared on October 13, 2011, Dr. Ekunsanmi diagnoses chest congestion, ankle pain, polyarthealgia, carpal tunnel syndrome, neuropathy, low back pain, and paresthesia, but could nor predict a prognosis until consultation with an orthopedic specialist (Tr. 429). He concluded that the plaintiff could sit for seven hours, stand or walk for up to two hours, could lift less than ten pounds frequently and ten pounds rarely, but could not stoop, push, kneel, pull, or bend (Tr. 430-31). Dr. Ekunsanmi also found that the plaintiff was capable of tolerating low work stress, but would be absent from work for two to three times per month (Tr. 431-32).

In *Smith v. Schweiker*, 795 F.2d 343, 345–46 (4th Cir. 1986), the court of appeals held that a non-treating and non-examining physician's opinion can constitute substantial evidence where the medical evidence from examining or treating physicians "goes both ways[.]" The administrative record shows that the plaintiff was treated for numerous one-time injuries or conditions in 2010. *See* Tr. at 199-207 (treatment on May 2, 2010, for "mild" foot injury resulting from fall off steps); 173 (treatment on August 26, 2010, for lower back pain after moving furniture during move to friend's house); 194 and 174 (treatment on September 2, 2010, and September 9, 2010, for rash on right arm); 175 (treatment on September 13, 2010, for back pain after the plaintiff went up and down concrete steps at her brother's house); and 252-54 (treatment for a broken ankle on

December 20, 2010).    But the diagnoses of the plaintiff's treating physician, Dr. Ekunsanmi, do not reflect any long-term effects of these injuries that would preclude light work.    As a result, the ALJ properly concluded that the plaintiff "has had repeated normal neurological examinations." (Tr. 22).

The defendant acknowledges that the ALJ did not explain the weight given to the residual functional capacity given to Dr. Anderson's and Dr. Hopkins' physical residual functional capacity assessments, as required by SSR 96-6p, 1996 WL 374180, at *2–4, but contends that this error was harmless because their conclusions indicate that the plaintiff can perform medium work, while the ALJ concluded that plaintiff could only perform light work (doc. 31 at 13 n. 6).  Dr. Anderson was a consultative physician who found that, as of October 18, 2010, that the plaintiff could occasionally lift fifty pounds, could frequently lift twenty-five pounds, and could stand, walk, or sit for six hours during an eight-hour workday (Tr. 245).  Dr. Hopkins, also a consultative physician, reached similar conclusions on July 15, 2011 (Tr. 270-77).  Essentially, the only difference between the findings of these two physicians was Dr. Anderson's finding that the plaintiff could only occasionally use ladders, ropes, scaffolds, and was precluded from hazards, such as machinery or heights (Tr. 246, 248), whereas Dr. Hopkins found no such limitations (Tr. 272-74).

Dr. Anderson's and Dr. Hopkins' findings indicate that the plaintiff could perform medium work as defined in the Regulations. *See* 20 C.F.R. § 404.1567(c) and § 416.1567(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work.").  The ALJ found that the plaintiff was restricted to light work.  See 20 C.F.R. § 404.1567(b) and § 416.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may

be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").  In light of the ALJ's finding that the plaintiff could perform only light work, the Commissioner's citation to the decision of the Seventh Circuit Court of Appeals in *Henke v. Astrue*, No. 12-2364, 498 Fed.App'x 636, 641 (7th Cir. Dec. 21, 2012) ("Dr. Chan opined that Henke was capable of doing medium work, which does not support a disability finding.  And the ALJ ultimately determined that Henke was capable of only light work, a finding more favorable to Henke than Dr. Chan's report."), is well taken.

Moreover, both Dr. Anderson and Dr. Hopkins concluded that the plaintiff's allegations of functional limitations were not credible. See Tr. at 245 (indicating that the severity of the plaintiff' "symptoms is not consistent with the medical evidence" and that the plaintiff's allegations "are several magnitudes worse than the clinical evidence would suggest); and Tr. 275 (indicating that the plaintiff is not credible concerning the severity of the alleged impairments, and noting that the fracture of the plaintiff's tibia should heal without "significant long-term sequellae").

The findings of Dr. Anderson and Dr. Hopkins are consistent with medical reports from the plaintiff's treating physicians during 2011. For example, in May 2011, Dr. Ekunsanmi denied the plaintiff's request for a power wheel chair or scooter, hydrocodone, Flexeril, and anxiety medication, and indicated that he had "[a]dvised patient to try to get back to a higher functional level (Tr. 459-60).  Although the plaintiff continued to experience pain from her broken right ankle when she went to Springs Memorial Hospital in July of 2011 (Tr. 346, 350, 461), her ankle was better by the time she was examined for

20

back pain at Springs Memorial Hospital on August 29, 2011 (Tr. 353-54).  The examination noted the absence of symptoms when the plaintiff did straight leg lifts, the absence of paralumbar tenderness, and the absence of paralumbar spasms (Tr. 354). Under circuit case law, a treating physician's opinion may be accorded less deference when it is not supported by his or her own treatment notes. *Craig v. Chater*, 76 F.3d at 590.

During the plaintiff's office visit to Premier Clinics on July 19, 2011, Dr. Ekunsanmi encouraged her to exercise for 30 minutes per day for five days a week (Tr. 461).  The plaintiff was also told to keep weight off the ankle ("non weight bearing") (Tr. 465).  According to progress notes dated October 6, 2011, from Premier Clinics, the plaintiff had not complied with the earlier directions to keep weight off the right ankle or to exercise (Tr. 465).  *See Bradey v. Ribicoff*, 298 F.2d 855, 857 (4th Cir. 1962) (available and affordable medical treatment must be sought before a condition can be considered disabling).

On February 20, 2012, the plaintiff was examined by Aran M. O'Malley, M.D., at Lancaster Orthopedics and Sports Medicine, when the plaintiff had been using a "cast boot" for her right foot and ankle.  Dr. O'Malley found "no acute body" abnormality, except for the healed fracture of the right ankle and ostopenia.  Also, Dr. O'Malley found no instability of the right foot/ankle or left foot/ankle, and noted that the plaintiff' strength was "5/5" in both the right foot/ankle or left foot/ankle (Tr. 502).  In light of the plaintiff's complaints of pain, Dr. O'Malley considered the possibility of stress fracture and ordered an MRI.  The MRI was taken at Springs Memorial Hospital on March 7, 2012 (Tr. 501). The MRI revealed no evidence of a stress fracture, but showed some narrowing at the first "MTP joint" and mild osteoarthritis evidenced by  irregularity in the mid-foot joints.  Dr. O'Malley  recommended "shoe-wear modification" and prescribed "custom orthotics" for the plaintiff (Tr. 501).

The medical evidence indicates that the treatment for the plaintiff's ankle injury was ultimately successful, although the treatment extended over a period of approximately sixteen months. *See Gross v. Heckler*, 785 F.2d at 1165 (if symptom or condition is treatable, it is not disabling); *cf. Mickles v. Shalala*, 29 F.3d 918, 922 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is a proper basis for a finding of no disability)(Hall, J., concurring).

Although the defendant indicates that the ALJ may have misheard the plaintiff's testimony relating to her going to outings, cookouts, and other social events (doc. 31, def.'s br. at 16, citing Tr. 21, 531-32), the activities described by the plaintiff in her Function Report on November 13, 2010, indicated that plaintiff could prepare sandwiches, "microwavable" food, walk when necessary for short distances and from ten to fifteen minutes, could watch television read, and could engage in social activities, such as church (Tr. 133-40), which was inconsistent with her testimony at the ALJ hearing that she was incapable of anything beyond preparing simple meals, sitting, reading, and watching television (Tr. 531-34).

The defendant calls attention to the numerous physical examinations which were "unremarkable[.]" (doc. 31 at 16). Those "unremarkable" results include the plaintiff's visit of August 26, 2010, to Premier Clinics (noting "no overt injry [injury] seen or palpated") (Tr. 173); the plaintiff's visit of August 13, 2009, to Premier Clinics (noting only small lesion on neck and only tenderness on left writ flexion) (Tr. 176); the plaintiff's examination at the Springs Memorial Hospital emergency on January 24, 2011 (only knee contusion) (Tr. 324-25); and the plaintiff's examination at Piedmont Medical Center on May 1, 2010 (noting normal range of motion in all four extremities and stating that "patient does not have an emergency medical condition") (Tr. 365-66).

Although the plaintiff alleged carpal tunnel syndrome in her application and the condition was diagnosed in August of 2009, the only symptom noted was left wrist pain

22

(Tr. 177).  Hence, the ALJ properly concluded that "there were no objective deficits of weakness, atrophy, or sensory loss." (Tr. 22).  In fact, there is no indication that the plaintiff sought subsequent treatment for carpal tunnel syndrome (Tr. 31).  As a result, there are no records indicating that the plaintiff has undergone commonly-used tests for carpal tunnel syndrome, which would indicate what limitations are affecting the plaintiff other than wrist pain. *See Manning v. Colvin*, Civil Action No. 6:12-2577-SB, 2014 WL 1232779, at *8 n. 4 (D.S.C. Mar. 24, 2014) ("Tinel's and Phalen's sign tests are commonly used by physicians to diagnose carpal tunnel syndrome."), which was a case where carpal tunnel syndrome was conclusively established in the administrative record.  The ALJ's findings that the plaintiff's limitations, including carpal tunnel syndrome, permitted the plaintiff to perform light work is supported by substantial evidence. *See Baker v. Colvin*, Civil Action No. 1-12-2534-SVH, 2014 WL 608442, at *13 (D.S.C. Feb. 14, 2013).

A claimant in a Social Security disability claim has the duty to furnish all relevant medical evidence and to carry the burden of proving that he or she is disabled. *See* 20 C.F.R. § 404.1512(a); and *Croteau v. Colvin*, Civil Action No. 5:13-1472-RMG, 2014 WL 2505648, at *4 (D.S.C. May 14, 2014).  The plaintiff has not established that she cannot perform light work.

A reviewing court may not disagree with an ALJ's clear resolution of issues relating to credibility, *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984), or conflicting evidence, *Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012) ("The ALJ had the duty to find facts and consider the import of conflicting evidence.").  In reviewing a Commissioner' decision, reviewing district courts "do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig v. Chater*, 76 F.3d at 589.  The ALJ properly resolved the conflicting medical and non-medical evidence (including the plaintiff's testimony). *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (Section 405(g) precludes *de novo* review, and requires a court to

uphold the Commissioner's decision "even should the court disagree with such decision as long as it is supported by 'substantial evidence.'").

### Worker's Compensation Claim

As stated earlier, in her response brief, the plaintiff refers to a worker's compensation claim (doc. 33 at 1). Even if the plaintiff is awarded worker's compensation benefits, a Social Security claimant's receipt of other government benefits is not a basis for awarding or denying Social Security benefits. *See*, *e.g.*, 20 C.F.R. § 404.1504 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us."); and *Taylor v. Sec. of HHS*, No. 5:91-1321-17(H), 1991 WL 335837, at *15 n. 21 (D.S.C. Dec.10, 1991). In other words, an award of worker's compensation benefits to a claimant is not determinative of his or her inability to engage in substantial gainful activity. *See DeLoatche v. Heckler*, 715 F.2d 148, 150 n. 1 (4th Cir.1983) ("Neither the opinion of a treating physician nor the determination of another governmental entity are binding on the [Commissioner].").

### Medical Records Submitted with Plaintiff's Response Brief

Appended to the plaintiff's response brief were recent medical records. Those records included a copy of discharge instructions dated January 1, 2014 from Springs Memorial Hospital (doc. 33, pl.'s resp. br. at 2-6); and a list dated January 1, 2014, of the plaintiff's medications compiled by Springs Memorial Hospital (doc. 33 at 7). These new medical records concern treatment received more than sixteen months after the issuance of the ALJ's decision on August 22, 2012, and do not meet the materiality standards for a remand under sentence six of 42 U.S.C. § 405(g). *See Tripp v. Colvin*, Civil Action No. 8:12-3450-TMC, 2014 WL 2987706, at *4 & n. 5 (D.S.C. July 1, 2014)

(noting statutory amendments made to 42 U.S.C. § 405(g) subsequent to *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985), but concluding that the *Borders* inquiry is still applicable in Fourth Judicial Circuit).

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 30, 2014
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (*quoting* Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk of Court**
**United States District Court**
**300 East Washington Street — Room 239**
**Greenville, South Carolina 29601**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).